630 So.2d 548 (1993)
THE FLORIDA BAR, Complainant,
v.
William A. CALVO, III, Respondent.
No. 78395.
Supreme Court of Florida.
December 16, 1993.
Rehearing Denied February 10, 1994.
*549 John F. Harkness, Jr., Executive Director, John T. Berry, Staff Counsel, Tallahassee, and Stephen C. Whalen, Bar Counsel, Fort Lauderdale, for complainant.
William A. Calvo, III, pro se.
PER CURIAM.
We have for review the complaint of The Florida Bar and the referee's report recommending that William A. Calvo, III, a Florida attorney, be disbarred for alleged ethical violations.[1] We have jurisdiction. Art. V, § 15, Fla. Const.
In 1985, Calvo was working as counsel to persons involved in the sale of federally regulated securities, an area of law in which he possessed special expertise. Under applicable regulations, Calvo and his clients were required to sell a minimum of twelve million shares within 150 days of the effective date of the prospectus, with a closing date no later than April 7, 1985. Failure to meet these requirements would mean that all monies paid by purchasers of the securities had to be returned.
It became apparent that the minimum number of shares would not be sold within the deadline. At this juncture, Calvo either became aware that his clients had arranged to obtain very short-term "flash" loans or he participated in obtaining those loans. The loan proceeds then were used to create the appearance that the minimum number of shares were being sold. Those who loaned the money in turn were paid exorbitant fees, with one man receiving a profit of $74,350 for the use of a quarter million dollars for a single day. The net result was that the corporation actually was capitalized at less than fifteen percent of the required amount.
In March 1985, prior to the closing date, one of the principals involved in the securities offer was indicted in Maryland for mail fraud. Under applicable regulations, this was information that Calvo and his clients had a duty to disclose to potential investors in the securities. Calvo and his clients failed to fulfill this obligation.
Closing did not actually occur until almost two weeks later than required, on April 22, 1985. The late closing occurred without the proper filings of notice or permission of the governing authorities, which Calvo knew or should have known was required by law.
Initially, we are unpersuaded by Calvo's contention that the referee erred in not permitting G. Richard Chamberlain to both act as Calvo's counsel and as a potential material witness in the proceedings below.[2] The referee has substantial discretion in refusing to permit a witness to act as counsel, though there may be some circumstances in which the referee could abuse that discretion. We find no abuse of discretion here.
On the substantive issues, the referee's findings are supported by competent substantial evidence and must be accepted as fact by this Court. We reject Calvo's contention *550 that the referee considered improper matters in reaching his conclusions, and especially Calvo's contention that the referee improperly took notice of the SEC and federal cases that arose out of the conduct in question. See Securities & Exchange Comm'n v. Electronics Warehouse, Inc., 689 F. Supp. 53 (D.Conn. 1988), aff'd sub nom. Securities & Exchange Comm'n v. Calvo, 891 F.2d 457 (2d Cir.1989), cert. denied, 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 674 (1990); William A. Calvo, III, SEC Admin.Proc. No. 3-7038 (1990).
We agree with Calvo that SEC disciplinary proceedings are subject to a different standard of review than are Bar discipline proceedings, but we find that this difference goes only to the weight to be accorded the information in a Florida disciplinary proceeding, not to its admissibility. We find no error in the way the referee admitted and considered this information, especially in light of the overwhelming case against Calvo in the SEC proceedings.
On the question of Calvo's alleged misconduct, we note the following findings of the United States District Court of Connecticut:
Calvo's reckless conduct was a substantial factor in furthering the violations... . Calvo profited in that, by allowing the offering to close, his law firm received a $15,000 fee from the escrow funds which probably would not otherwise have been paid, a probability of which, by reason of the insufficient sale of stock, was all the more likely. The seriousness of the violations is reflected in [the corporation's] now defunct status and the investors' substantial losses, the result of the fraudulent offering.[18]
[18] The temporary receiver has recovered a portion of the funds, but investors apparently will not be fully reimbursed.
Electronics Warehouse, 689 F. Supp. at 69 & 69 n. 18 (citations omitted).
We also reject Calvo's contention that, because the misconduct was originated primarily by his clients, he was required to maintain confidentiality. Florida long has held that the rule of attorney-client confidentiality comes to an end when an attorney knows that a client is engaging in crime or fraud; and as an experienced securities lawyer, Calvo certainly understood or should have understood the nature of his clients' activities here, see, e.g., Fla.Bar Code of Prof. Resp.D.R. 4-101(D) (1985); R.Regulating Fla.Bar 4-1.6(b), which are detailed in the federal and SEC cases cited above.[3]
It is irrelevant whether or not the client subsequently is charged with a crime. Far too much criminal activity in today's society goes uncharged, and this fact alone does not excuse attorneys from failing to honor their obligations to the public at large. It is especially incumbent upon attorneys to use their legal expertise to discourage rather than further the type of flagrant fraud on the public involved in this case.
We further reject Calvo's contention that he was denied due process rights and that he cannot be disciplined under the rules of ethics in effect in 1985, which have been superseded by the new Rules Regulating The Florida Bar. As with any rules of attorney discipline promulgated by this Court, the supersedure abrogated the former rules of discipline only as to matters arising after the effective date of the new rules; the earlier rules remain fully enforceable as to events before that date. We find no other error.[4]
Based on the referee's findings, we agree that disbarment is appropriate here. In so concluding, we note in aggravation that Calvo previously has been privately reprimanded *551 for minor misconduct. However, we are most influenced by the grave potential for harm that Calvo helped create for the investors who purchased securities based on his or his clients' serious misrepresentations or omissions. While the referee noted that these investors appear to have received some restitution,[5] that fact alone does not obviate a disbarment. Restitution constitutes mitigating evidence, but it must be weighed against the aggravating evidence.
Here, we find the case severely aggravated, foremost by the great potential for harm to the public at large that Calvo helped create through his reckless misconduct or omissions. We further find this case aggravated by Calvo's substantial experience in the field of securities law, which was his specialty before the SEC discipline imposed upon him; by the vulnerability of the potential victims involved here; by the dishonest and selfish motive; and by the continuing pattern of misconduct exhibited over the course of Calvo's activities in 1985. See Fla.Stds.Imposing Law.Sancs. 9.22. This was not a case of a single ethical lapse, but of an orchestrated and deliberate pattern of serious misconduct by act or omission.[6] The Standards provide in pertinent part:
Disbarment is appropriate when:
... .
a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
Id. 5.11(f). The Standards further provide:
Disbarment is appropriate when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
Id. 7.1. "Conduct" for purposes of these rules can include deliberate omissions.[7]
We can conceive of few situations posing more serious harm to a large segment of the public than a fraudulent offering of securities. Such misconduct certainly is comparable to abuse of client trust funds, except that here the number of persons exposed to the risk of harm potentially was in the hundreds or thousands. Securities fraud of the type at issue here risks robbing many everyday citizens of their investments, their retirement savings, and their financial security. Calvo and his colleagues fraudulently sold securities that may have been worthless from the moment they were purchased. This is misconduct of a most serious order.
For the foregoing reasons, we agree with the referee that Calvo violated Disciplinary Rules 1-102(A)(1) and 1-102(A)(6) of the rules of discipline in effect at the times in question. Judgment for costs in the amount of $7,252.18 is hereby entered against Calvo and in favor of The Florida Bar, for which sum let execution issue. Calvo shall accept no new clients from the date this opinion is issued, and he is disbarred effective thirty days from the filing of this opinion so that Calvo can close out his practice and protect the interests of existing clients. If Calvo notifies this Court in writing that he is no longer practicing law and does not need the thirty days to protect existing clients, the Clerk of the Court is directed to enter an *552 order making the disbarment effective at that time.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] We previously have addressed a more limited question posed by this case. The Florida Bar v. Calvo, 601 So.2d 1194 (Fla. 1992).
[2] We recognize, of course, that Chamberlain ultimately was not called as a witness because the strategy of the parties changed as the case progressed. Nevertheless, the fact that he was a potential witness constituted sufficient grounds for the referee's ruling in light of the facts of this case.
[3] We fully agree with the federal district court's assessment that Calvo's acts or omissions at a minimum constituted reckless misconduct.
[4] We reject Calvo's contention that the referee heard improper expert testimony on the duties of an underwriter's counsel; that the referee improperly considered Calvo's prior disciplinary record; that the referee's report lacks factual or legal support; that Calvo was prejudiced by the delay between his misconduct and the present disciplinary proceeding; and that the complaint against Calvo should be dismissed on technical grounds. On this last point, Calvo notes that the chair of the grievance committee neglected to sign the complaint, which the Bar concedes. However, any error was ministerial and harmless in light of the fact that the chair testified below that the complaint accurately reflected the committee's findings.
[5] In this regard, the referee suggested that restitution may have "had something to do" with the escrow holder, Barnett Bank. The United States District Court of Connecticut, which examined Calvo's case, also concluded that only partial restitution had been made at the behest of the defunct corporation's receiver. Securities & Exchange Comm'n v. Electronics Warehouse, Inc., 689 F. Supp. 53 (D.Conn. 1988), aff'd sub nom. Securities & Exchange Comm'n v. Calvo, 891 F.2d 457 (2d Cir.1989), cert. denied, 496 U.S. 942, 110 S.Ct. 3228, 110 L.Ed.2d 674 (1990).
[6] We specifically reject Calvo's contention that his misconduct was a momentary lapse. To the contrary, through act or omission he helped his clients perpetrate a serious fraud on the public over a period of several weeks.
[7] The standards are relevant here because they constitute a codification of the Bar and this Court's longstanding customary practices in determining the severity of discipline due. The standards are not ethical standards in themselves, but are mere procedural guides for referees, the Bar, and this Court to use. As such, they are relevant, though not necessarily binding, in all disciplinary cases, including those arising under earlier disciplinary codes.